Argued and submitted September 11, 2006, decision of Court of Appeals reversed;
final order of Teacher Standards and Practices Commission reversed,
and case remanded to Teacher Standards and Practices Commission
for further consideration February 8, 2007

## TEACHER STANDARDS AND
## PRACTICES COMMISSION,
*Respondent on Review,*

*v.*

## Karin L. BERGERSON,
*Petitioner on Review.*

## (TSPC 584001-GE0327-01; CA A122752; SC S52842)

153 P3d 84

See also 341 Or 401, 144 P3d 918.

Thomas K. Doyle, of Bennett, Hartman, Morris & Kaplan LLP, Portland, argued the cause and filed the brief for petitioner on review. With him on the brief was Aruna A. Masih.

Judy C. Lucas, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before De Muniz, Chief Justice, and Carson, Gillette, Durham, Riggs, and Balmer, Justices.**

** Carson, J., retired December 31, 2006, and did not participate in the decision of this case. Riggs, J., retired September 30, 2006, and did not participate in

GILLETTE, J.

the decision of this case. Kistler, Walters, and Linder, JJ., did not participate in the consideration or decision of this case.

**GILLETTE, J.**

In this judicial review proceeding, a long-time elementary school teacher challenges a final order of the Teacher Standards and Practices Commission (TSPC) suspending her teaching license for a period of 60 days. She contends that the order does not establish that certain acts that she committed in 2001 constitute either "gross neglect of duty" or "gross unfitness," as those terms are used in the statutes and rules that authorize the TSPC to suspend teachers' licenses. She also challenges the TSPC's order on the ground that the TSPC failed to identify and explain modifications that it made to a proposed order issued by the administrative law judge (ALJ) who heard the case. We conclude that petitioner's challenges are well taken. Accordingly, we reverse the decision of the Court of Appeals that upheld the TSPC order. We also reverse the final order of the TSPC and remand the case to the TSPC for further consideration.

## FACTS AND PROCEDURAL BACKGROUND

Although certain factual findings in the TSPC's order are a subject of controversy, there appears to be no dispute about the following facts. Petitioner graduated from the Oregon College of Education in 1976 and married a few years later. In 1986, having already had some teaching experience, petitioner accepted a teaching position in an elementary school in the Salem-Keizer School District, where she remained for the next 15 years. During that 15-year period, petitioner consistently received positive performance reviews.

In 1998, petitioner and her husband began to experience marital difficulties and, in December 1999, petitioner's husband moved out of the family home. A few months later, petitioner's husband moved in with Siebler, a girlfriend. He did not tell petitioner where he was living or about his relationship with Siebler. Petitioner apparently continued to hope that she and her husband would reconcile.

On August 22, 2000, petitioner's husband was seriously injured in a motorcycle accident and was taken to a hospital in Portland. Petitioner was contacted as the next of kin.

She rushed to the hospital, signed the necessary medical authorizations, and remained at her husband's bedside for the next three days. Petitioner's husband was in a coma for the next few weeks and underwent five surgeries. Petitioner rearranged her work schedule and traveled from Salem to Portland every day to be with her husband and to participate in medical decisions.

On September 12, 2000, a Salem lawyer visited petitioner's husband in the hospital. During the lawyer's visit, petitioner's husband signed a durable power of attorney appointing the lawyer as his agent.[1] Within a week, the lawyer was working toward filing a divorce action on behalf of petitioner's husband. In conjunction with those efforts, the lawyer moved for and obtained a temporary *ex parte* order enjoining petitioner and her husband from altering marital assets or insurance policies and from "harassing, molesting, or interfering in any manner with the other." The lawyer then sent a letter to petitioner's domestic relations lawyer to the effect that petitioner's husband did not want petitioner to contact or visit him. Petitioner's lawyer advised her that she should limit contact with her husband to discussions concerning the couple's two children and their joint financial obligations.[2]

On September 24, 2000, petitioner's husband was transferred to a rehabilitation center in Salem. There, petitioner walked into her husband's room while Siebler was visiting and learned, apparently for the first time, that her husband had a girlfriend and had been living with her. At around that time, petitioner also learned that her husband had filed for divorce.

Later in the fall, petitioner experienced another emotional setback: She learned some very troubling news concerning her 17-year-old son. Petitioner also was experiencing financial difficulties, at least in part because her husband refused to pay child support for one of the couple's two children.

---

[1] Apparently, petitioner's husband had spoken to the lawyer a week or two before the accident about filing for divorce. Siebler worked as a paralegal in that lawyer's office.

[2] It is unclear from the record when petitioner retained counsel, or why.

On January 6, 2001, petitioner drove to the home that her husband was sharing with Siebler, hoping to speak to him and to deliver certain items to him. After an acrimonious interchange with her husband on Siebler's doorstep, petitioner returned to her car, which was parked down the street, and ingested a large quantity of three different prescription medications. Petitioner then drove her car up the street, turned into Siebler's driveway, and slammed her car into the rear of her husband's unoccupied truck. The truck was pushed forward by the impact into Siebler's garage door, which was destroyed along with a brick facade on the house's exterior. Petitioner's car was going between 20 and 30 miles per hour when it crashed into the truck.

Following the crash, Keizer police officers and paramedics arrived and found petitioner slumped over the steering wheel of her car, disoriented and unresponsive. She was transported to Salem hospital. After a one-night medical stay, petitioner admitted herself to the hospital's psychiatric unit, where she remained for seven days. There, her treating psychiatrist diagnosed her with "Major Depressive Disorder, single episode, severe." Upon her release, she began treatment with another psychiatrist.

Petitioner ultimately was charged in the incident with four counts of criminal mischief in the first degree. Pursuant to a plea agreement, she pleaded no contest to one of the four counts. She was sentenced to a term of probation that provided that, if she fulfilled all the conditions of probation and paid restitution for the damage that she had caused, the court would dismiss the charge.

Two articles about the incident appeared in local newspapers. Both articles reported, erroneously, that petitioner had been driving 80 miles per hour at the time of the accident. Parents, teachers, and students at petitioner's school learned about the incident through those newspaper articles and word of mouth. A number of parents contacted the school at that time and expressed concern about petitioner's fitness to teach.

Petitioner took a number of months off from work but eventually, with the agreement of her treating psychiatrist, announced that she was ready to return to the classroom. However, the district superintendent recommended to

the school board that petitioner be dismissed, based on the January 2001 incident. The school board ultimately accepted that recommendation and terminated petitioner, effective January 2002.

Petitioner appealed her termination to the Fair Dismissal Appeals Board (FDAB). After a hearing, the FDAB reversed the dismissal and ordered the school district to reinstate petitioner. The district sought judicial review of that order and also sought to stay enforcement of the order pending judicial review. The FDAB denied the requested stay and the Court of Appeals affirmed that decision. *Bergerson v. Salem-Keizer School Dist.*, 185 Or App 649, 60 P3d 1126 (2003). Later, the Court of Appeals held that the FDAB had not adequately explained its reason for concluding that the dismissal was unreasonable and excessive, and remanded. *Bergerson v. Salem-Keizer School Dist.*, 194 Or App 301, 95 P3d 215 (2004). We recently affirmed that Court of Appeals decision. *Bergerson v. Salem-Keizer School Dist.*, 341 Or 401, 144 P3d 914 (2006).

In the meantime, petitioner's conduct had come to the attention of the TSPC, which is authorized to suspend or revoke the licenses of teachers and school administrators for, among other things, "gross unfitness" and "gross neglect of duty." ORS 342.175(1)(b) and (c); *see also* OAR 584-020-0040(4) (TSPC rule defining gross neglect of duty); OAR 584-020-0040(5) (TSPC rule defining gross unfitness). The TSPC ultimately charged petitioner with "gross unfitness" and "gross neglect of duty" in late 2002.

Petitioner requested a hearing. Pursuant to ORS 342.177(1)(a), the TSPC engaged an ALJ from the Office of Administrative Hearings to conduct that hearing. After the hearing, the ALJ issued a proposed order that included extensive findings of fact and conclusions of law. The ALJ concluded that petitioner's actions *did* constitute a crime—criminal mischief in the first degree. However, the ALJ ultimately determined that those acts did not amount to "gross neglect of duty," as that term is defined in TSPC's administrative rules, because there was no "demonstrable relationship" between the conduct and petitioner's professional duties as a teacher. The ALJ also rejected the TSPC's theory

that the incident rendered petitioner "grossly unfit" because the notoriety that the incident generated in the community made it difficult for her to carry out her job as a teacher. Finally, the ALJ found that various mitigating circumstances, including the fact that the conduct had occurred at a time when petitioner was facing a variety of very distressing personal issues, weighed "overwhelmingly on the side of mitigation." Accordingly, the ALJ concluded that suspension of petitioner's teaching license was not warranted.

Thereafter, the TSPC issued a proposed final order that deleted or altered some of the ALJ's findings of fact and added a large number of its own findings. The proposed final order also reached a different set of conclusions. Specifically, it concluded that petitioner's actions amounted to both "gross neglect of duty" and "gross unfitness," that the conduct was not an isolated event but the culmination of a months-long pattern of improper conduct, that petitioner's distressing personal circumstances were not grounds for mitigation, and that suspension of petitioner's teaching license was warranted.

Petitioner filed exceptions to the TSPC's proposed final order, arguing that the order was contrary to the evidence and that it relied on erroneous interpretations of the TSPC's statutes and administrative rules. Petitioner also noted that the TSPC's proposed order drastically modified the ALJ's findings and legal conclusions. She excepted to "each and every instance where the [TSPC] has changed, altered, deleted, or in any other way differed from [the ALJ's] decision in this matter." In spite of petitioner's exceptions, the TSPC entered the proposed final order as its final order on October 9, 2003. Petitioner sought judicial review of that final order in the Court of Appeals, and that court affirmed the final order of the TSPC without opinion. *Teacher Standards and Practices v. Bergerson*, 200 Or App 415, 115 P3d 988 (2005).

Petitioner then sought review by this court. We allowed her petition to consider (1) whether the TSPC properly interpreted and applied the relevant statutes and rules; and (2) whether the TSPC violated applicable procedural restrictions by substantially modifying the ALJ's proposed

order without identifying and adequately explaining those modifications.

## APPLICABLE LAW

Before we address petitioner's specific concerns, we set out the relevant statutes and administrative rules. ORS 342.175 authorizes the TSPC to suspend or revoke teachers' licenses. Subsection (1) of that statute sets out various grounds for suspension or revocation, including:

"(b)  Gross neglect of duty;

"(c)  Any gross unfitness[.]"

Subsection (5) of ORS 342.175 also refers to "gross neglect of duty" and "gross unfitness." It provides:

"Violation of rules adopted by the commission relating to competent and ethical performance of professional duties shall be admissible as evidence of gross neglect of duty or gross unfitness."

ORS 342.175(5).

Citing the latter subsection as authority, the TSPC has adopted "Standards for Competent and Ethical Performance of Oregon Educators" (TSPC Standards), which appear at OAR 584-020-0005 through 584-020-0045. One part of the TSPC Standards defines "gross neglect of duty" in the following terms:

"Gross neglect of duty is any serious and material inattention to or breach of professional responsibilities. The following may be admissible as evidence of gross neglect of duty. Consideration may include but is not limited to:

"* * * * *

"(o)  Substantial deviation from professional standards of ethics set forth in OAR 584-020-0035[.]"

OAR 584-020-0040(4). Another part of the TSPC Standards, OAR 584-020-0035, sets out the "professional standards of ethics" cross-referenced in the foregoing rule. It includes the following admonition, upon which the TSPC relies:

"The ethical educator is a person who accepts the requirements of membership in the teaching profession and acts *at*

*all times* in ethical ways. In so doing the ethical educator considers the needs of the students, the district, and the profession.

"* * * * *

"(3)   The ethical educator, in fulfilling obligations to the profession, will:

"(a)   Maintain the dignity of the profession by *respecting and obeying the law*, exemplifying personal integrity and honesty[.]"

OAR 584-020-0035 (emphasis added).

The TSPC Standards also define "gross unfitness" that may trigger a proceeding to suspend a teacher's license:

"Gross unfitness is any conduct which renders an educator unqualified to perform his or her professional responsibilities. Conduct constituting gross unfitness may include conduct occurring outside of school hours or off school premises when such conduct bears a demonstrable relationship to the educator's ability to fulfill professional responsibilities effectively. The following may be admissible as evidence of gross unfitness. Consideration may include but is not limited to:

"* * * * *

"(e)   Admission of or engaging in acts constituting criminal conduct, even in the absence of a conviction[.]"

OAR 584-020-0040(5).

Based on the foregoing administrative rules, the TSPC concluded that petitioner's license should be suspended for "gross unfitness" as it is defined in OAR 584-020-0040(5)(e), because her acts on January 6, 2001, were "acts constituting criminal conduct," *i.e.*, criminal mischief, a Class C felony, and, because, as those acts became known in the school community, they had a detrimental effect on her ability to perform her job. In a related vein, the TSPC concluded that petitioner's license should be suspended for "gross neglect of duty" because her criminal conduct on January 6, 2001, constituted a "substantial deviation" (OAR 584-020-0040(4)(o)) from the TSPC's ethical requirement, set out at

OAR 584-020-0035(3)(a), that teachers maintain the dignity of the profession by obeying the law at all times.

## GROSS NEGLECT OF DUTY

■        We turn, first, to the charge of "gross neglect of duty." Petitioner contends that the TSPC's administrative rule defining "gross neglect of duty" ignores a requirement that is implicit in the statutory term—that there must be a clear nexus between the conduct at issue and the teacher's *professional* responsibilities. Petitioner contends that the administrative rule departs from that implicit requirement insofar as it defines "gross neglect of duty" to include any breach of the teacher's duty to behave ethically *at all times*. Petitioner thus argues that the TSPC's decision to suspend her teaching license relies on a rule that is invalid because it is contrary to the legislature's intent.

In its final order, the TSPC essentially acknowledged that "gross neglect of duty" is limited to conduct that bears some relationship to the professional responsibilities of teachers (indeed, it is hard to imagine that the word "duty" in that phrase could refer to anything other than *professional* responsibilities). The TSPC insisted, however, that such a nexus existed:

> "Under ORS 342.165(5) and 342.175(1), the Commission has authority to establish standards of professional conduct and to define gross neglect of duty and gross unfitness. It has defined gross neglect of duty to include a substantial deviation from professional ethics under the rules relating to the ethical conduct. OAR 584-020-0040(4)(o). This rule states that an educator will act ethically 'at all times[,]' OAR 584-020-035; and in fulfilling this obligation, will 'maintain the dignity of the profession by respecting and obeying the law, exemplifying personal integrity and honesty.
>
> "The plain text of the rule defines a teacher's professional obligation to include respecting and obeying the law. The rule does not limit this obligation to conduct at school or during school hours. In fact, the rule expressly imposes the obligation to act ethically 'at all times.' "

Thus, the TSPC's order does not assert any particular relationship between petitioner's criminal conduct and a

teacher's professional responsibilities, as those responsibilities commonly are understood. Rather, it relies on the fact that the TSPC itself has promulgated rules defining the professional responsibilities of teachers to include a duty to obey the law "at all times."

The question, of course, is whether the TSPC has authority for disciplinary purposes to define the professional duties of teachers in that manner. The TSPC claims that it does: It contends that, inasmuch as ORS 342.175(5) provides that violation of "rules adopted by the [TSPC] relating to competent and ethical performance of professional duties shall be admissible as evidence of gross neglect of duty or gross unfitness," that statute broadly delegates policy-making authority to the TSPC with respect to defining teachers' professional duties. The TSPC also contends that the phrase "gross neglect of duty" is, in itself, delegative, in the sense that this court discussed in *Springfield Education Assn. v. School Dist.*, 290 Or 217, 621 P2d 547 (1980): Like other terms identified as delegative in *Springfield*—"good cause," "fair," "unfair," "undue," and "unreasonable"—the phrase "gross neglect of duty" " 'calls for completing a value judgment that the legislature itself has only indicated.' " *Id.* at 228 (quoting *McPherson v. Employment Division*, 285 Or 541, 550, 591 P2d 1381 (1979)).

We are not persuaded. It is true that the phrase "gross neglect of duty" invites further specification. It also is true that the statutes convey general rulemaking authority to the TSPC, ORS 342.165(1), as well as specific authority to adopt rules "relating to competent and ethical performance of professional duties," ORS 342.175(5). But those circumstances do not add up to a delegation of authority to expand the notion of professional duty beyond the scope that the legislature intended the term to have. In fact, because ORS 342.175(1)(b) and (5) refer to a teacher's professional "duty," any rulemaking authority that the TSPC might garner from those provisions is limited by the *legislature's* view of the boundaries of that term. In other words, at least with respect to that term, the TSPC's role is interpretive, not legislative.

In the present case, the TSPC relied on rules that define a teacher's professional duties as including a requirement that teachers behave ethically and lawfully at all times

and provide that any substantial deviation from that requirement is sanctionable as "gross neglect of duty." Our task is to determine whether those definitions are consistent with the legislature's intent. We conclude, with little difficulty, that they are not. In ordinary parlance, professional duties are specific to a profession and are distinct from the moral and civic obligations of all citizens to behave ethically and to obey the law at all times. There is nothing in the statutes to indicate that the legislature intended the term "professional duty," as expressed in ORS 342.175(5) and implied in ORS 342.175(1)(b), to have anything other than that ordinary meaning. Depending on the profession at issue, there may be some areas where professional responsibilities and universally applicable moral and civil obligations may overlap, but the TSPC's position that teachers have a *professional* obligation to behave ethically and lawfully "at all times" eradicates the boundary between private and professional obligations altogether. The rule, at least as the TSPC purports to employ it in its final order in this case, is inconsistent with the the legislature's intent.[3] The TSPC offers no other basis for arguing that petitioner neglected her duties. It follows that the TSPC's rationale for suspending petitioner for "gross neglect of duty" is erroneous.

## GROSS UNFITNESS

■    We turn to the issue of "gross unfitness." OAR 584-020-0040(5), promulgated by the TSPC, defines "gross unfitness" in general terms as "any conduct which renders an educator unqualified to perform his or her professional responsibilities." The same rule expressly requires that, when off-duty conduct is at issue, the conduct must be related to the teacher's professional duties: "Conduct constituting gross unfitness may include conduct occurring outside of

---

[3] We note that the ALJ interpreted the rules as extending to unlawful and unethical conduct that occurs off-duty and off-premises, but only if there is a specific and demonstrable nexus between the conduct and an educator's professional responsibilities. The ALJ relied on the repeated use of the term "profession" in OAR 584-020-0035(3)(a) (an ethical educator "accepts the requirements of membership in the teaching *profession*," "considers the needs of the * * * *profession*," and "maintains the dignity of the *profession*" in "fulfilling the obligations of the *profession*") and the explicit reference to "breach of *professional* responsibilities" in OAR 584-020-0040(4)(o). That interpretation of the rule may be consistent with the legislative intent expressed in ORS 342.175, but the TSPC declined to adopt it.

school hours and off school premises *when such conduct bears a demonstrable relationship to the educator's ability to fulfill professional responsibilities effectively*." *Id.* (Emphasis added.) Finally, the rule explicitly declares that "acts constituting criminal conduct" may be considered as evidence of gross unfitness. OAR 584-020-0040(5)(e).

In its final order, the TSPC concluded that petitioner should be suspended for "gross unfitness," based on the January 6, 2001, incident, because the reactions of students, parents, and other members of the school community who learned about the incident from newspaper accounts had some demonstrable negative impact on petitioner's ability to perform her professional duties effectively. According to the TSPC's final order:

> "As a result of [petitioner's] conduct, a significant number of parents were concerned about the safety of their children, the reliability of [petitioner] and the ability of the district to insure an appropriate and safe learning environment. The incident had a negative effect on the public image of the school, a negative effect on [petitioner's] ability to relate to her students and parents and a negative effect on her ability to be an effective classroom teacher."

Notably, the final order addressed only that part of the rule that pertains specifically to off-duty conduct (*i.e.*, the part that provides that off-duty conduct may constitute gross unfitness only if it bears a demonstrable relationship to the teacher's professional effectiveness). In fact, the order suggested that the rule's broader point—that "gross unfitness" is conduct rendering a teacher *unqualified* to perform his or her professional duties—is irrelevant.[4] The TSPC also expressly rejected petitioner's argument that the rule is directed solely at the teacher's ability to carry out his or her professional responsibilities effectively *at the time of the hearing*. It relied entirely on the immediate reactions of students, staff, and the community to the events of January 6, 2001, to find that petitioner's conduct has had a detrimental effect on her teaching effectiveness.

---

[4] Before this court, however, the TSPC clearly acknowledges that, under its own rule, it must show that petitioner's conduct rendered her "unqualified to perform * * * her professional responsibilities."

Petitioner contends that the TSPC's final order is erroneous insofar as it suggests that, with respect to the charge of "gross unfitness," the relevant inquiry is whether the conduct has had a "negative effect" on a teacher's ability to perform her duties, rather than whether the conduct renders the teacher "unqualified" to perform such duties. We agree with petitioner that the rule incorporates a standard— "*unqualified*"—to which the final order is unresponsive, in that it suggests that all that is required is some "negative effect" on the performance of duties.

In response, the TSPC suggests that the final order reflects its own "plausible interpretation" of OAR 584-020-0040(5)(e) as "permitting the commission to conclude from the evidence of criminal conduct and the other circumstances in a particular case that the criminal conduct rendered the teacher unqualified." It contends that, because OAR 584-020-0040(5)(e) is its own rule, we should accept its interpretation unless we conclude that that interpretation is inconsistent with the rule's text and context or with some other source of law. Applying that "interpretation," the TSPC now suggests that:

> "the commission was entitled to conclude from the findings that parents did not want [petitioner] to return to her class and that parents and teachers were 'alarmed' by her conduct, and from the evidence that parents' confidence in the safety of her classroom was undermined as a result of her conduct, that [petitioner] was unqualified, under the rule."

Even if we accept the TSPC's claim that we owe deference to any plausible TSPC interpretation of its own rule, no such deference would be due in the present case because the TSPC's asserted "interpretation" of the rule is not an interpretation at all. It is merely a claim of authority to determine, on an ad hoc basis, that a set of circumstances amounts to grounds for suspension. Moreover, the TSPC's final order never alluded to that "interpretation," or to the "unqualified" standard that the TSPC now purports to interpret. However much it may seek to explain its decision now, the TSPC cannot escape the fact that its final order never explained how the facts on which it relied—parent and student complaints, and press coverage—demonstrated that petitioner was unfit. The most that can be said of that evidence is that some people

(none of them educational professionals) *wondered* if petitioner were unfit. But the legal standard that the TSPC was purporting to apply focuses on petitioner's actual capacity, not on others' attitudes about that capacity.

Petitioner also argues that the TSPC's explanation misses the fact that both the term used in OAR 584-020-0040(5)—"unqualified"—and the term used in ORS 342.175(1)(c)—"unfitness"—refer to a persistent status or character trait, and not simply to an instance of unlawful or undesirable conduct. Petitioner acknowledges that an instance of bad behavior may exemplify or demonstrate that a teacher is "unqualified" or "unfit," but argues that the TSPC's final order does not discuss her conduct in that light. Rather, she notes, the order appears to treat any conduct that has a deleterious effect on a teacher's performance as *equivalent* to gross unfitness. Petitioner also notes that the TSPC's evidence in support of "gross unfitness" all relates to *past* community reaction to the incident, while the TSPC's rule appears to contemplate that there will be a sufficient *present* relationship to a teacher's professional responsibilities.

We agree with petitioner that the phrase "unqualified to perform * * * professional responsibilities" in OAR 584-020-0040(5) can be read to implicate only a status or trait that is both harmful and persistent. Although it is true that the rule refers to "conduct," it is specifically limited to conduct that "renders [a teacher] unqualified." That limitation is satisfied only if the conduct causes or demonstrates a lack of qualification, *i.e.*, some status or trait that establishes that the teacher cannot fulfill her professional responsibilities.

In our view, OAR 584-020-0040(5) must be read in that manner, *i.e.*, as referring primarily to a disqualifying status or trait, in order to remain consistent with the statutory term—"gross unfitness"—that it purports to interpret: Like the term "unqualified," "unfitness" suggests a disqualifying status or trait, rather than a single, simple instance of undesirable conduct.[5] That focus on a trait or status is confirmed by the overall context in which the term "gross unfitness" appears. We assume that, when the legislature authorized the TSPC to suspend teachers for "gross unfitness" in

---

[5] Obviously, there could be single instances of conduct—shooting the principal over a teaching assignment comes to mind—that would be disqualifying. But this case is nothing like that extreme example.

ORS 342.175(1)(c), it did *not* intend merely to duplicate the conduct-based reason for suspension that immediately preceded it at ORS 342.175(1)(b), *i.e.*, "gross neglect of duty." Given the statutory context, we read the phrase "conduct that renders an educator unqualified" in OAR 584-020-0040(5) as focusing on conduct only insofar as such conduct demonstrates or causes a disqualifying character trait or status.

We also agree with petitioner that OAR 584-020-0040(5) authorizes suspension only when the disqualifying status or character trait exists *at the time of the hearing*. We note, in that regard, that the rule uses the present tense: It refers to conduct that *"renders* [the teacher] unqualified" to perform his or her professional duties and, more specifically, to off-duty conduct that *"bears* a demonstrable relationship" to his or her ability to perform such duties.

The TSPC brushes aside the choice of tense, arguing on policy grounds for an interpretation that looks at past as well as present conditions. It argues that a present-focused reading would preclude it from disciplining teachers for off-duty conduct "in all cases where the teacher had made rehabilitat[ive] progress between the time of the offense—no matter how egregious—and the time of the hearing." But even if that were true,[6] we cannot ignore the clear import of the rule's choice of tense.

In summary, OAR 584-020-0040(5) refers to a character trait or status that is incompatible with a teacher's professional responsibilities. Such a trait or characteristic may be demonstrated by the teacher's past conduct, but the trait or characteristic must exist at the time of the TSPC disciplinary hearing. To the extent that the TSPC seeks to show that such a trait or status exists through a teacher's past *off-duty* conduct, it must show that the conduct is substantially related to the teacher's *present* ability to teach effectively.

The TSPC's position in its final order—that "gross unfitness" refers to a teacher's past as well as current fitness

---

[6] In fact, there appears to be no impediment to suspending or otherwise disciplining a teacher for any past offense that amounts to "gross neglect of duty," regardless of any intervening rehabilitative progress.

to teach—is inconsistent with OAR 584-020-0040(5) and the statute, ORS 342.175, that that rule purports to apply.

## THE TSPC'S MODIFICATIONS
## OF THE ALJ'S PROPOSED ORDER

■      We have concluded that the TSPC's final order relies on erroneous interpretations of the relevant rules and statutes. Those conclusions constitute sufficient grounds for reversal, and, therefore, we could conclude our opinion at this point. However, we believe that a discussion of one of petitioner's other arguments is warranted. Specifically, petitioner argues that the TSPC failed to identify and explain various substantial modifications that it made to the ALJ's proposed order in its final order, thereby violating ORS 183.650.

ORS 183.650 provides, in part:

"(1)   In any contested case hearing conducted by an administrative law judge assigned from the Office of Administrative Hearings, the administrative law judge shall prepare and serve on the agency and all parties to the hearing a form of order, including recommended findings of fact and conclusions of law. * * *

"(2)   If the administrative law judge assigned from the office will not enter the final order in a contested case proceeding, and the agency modifies the form of order issued by the administrative law judge in any substantial manner, the agency must identify the modifications and provide an explanation to the parties to the hearing as to why the agency made the modifications."[7]

_____

[7] At the time of petitioner's hearing, the provision at issue did not appear in the Oregon Revised Statutes as ORS 183.650. It was enacted as part of a centralized hearings office "pilot project," as section 12 of Oregon Laws 1999, chapter 849. Under section 1 of that same statute, the entire pilot project, including section 12, had been "added to and made part of ORS 183.310 to 183.550."

The original 1999 act, including section 12, was scheduled to sunset on January 1, 2004. Or Laws 1999, ch 849, § 214. However, in 2003, the legislature enacted an amended version of the provision, along with other centralized hearings officer provisions, on a permanent basis. Or Laws 2003, ch 75, § 11. The provision was then codified at ORS 183.650. For the sake of convenience, we hereinafter refer to it as ORS 183.650.

Petitioner notes that, in her case, an ALJ was assigned from the Office of Administrative Hearings to preside over her TSPC hearing and that, after the hearing, the ALJ issued a proposed order that contained recommended findings of fact and conclusions of law, as ORS 183.650(1) requires. Petitioner further notes that the TSPC did not adopt the ALJ's proposed order but, instead, issued its own final order that modified the ALJ's proposed form of order in a number of significant respects. First, it deleted a number of the ALJ's factual findings, sometimes substituting its own alternative findings and sometimes not.[8] It also added a large number of its own factual findings (petitioner identifies 17 such additions), many of which were directed at supporting the TSPC's theory that petitioner had been "stalking" her husband for several months before the January 2001 incident, in spite of clear signals that her husband did not want any contact with her. Finally, the TSPC reversed the conclusions of law that the ALJ reached, relying at least in part on its factual deletions, substitutions, and additions. Petitioner contends that those modifications were "substantial" within the meaning of ORS 183.650(2).

Petitioner acknowledges that the TSPC identified and explained a few of the foregoing modifications in its final order. For example, the TSPC expressly rejected, as unsupported by a preponderance of the evidence, the ALJ's findings that (1) petitioner had not received copies of certain letters from her husband's attorney; (2) petitioner's husband had consented to some contacts between the parties; and (3) petitioner's husband had told petitioner that "he agreed they should talk, but not at this time."[9] Petitioner observes, however, that the vast majority of the TSPC's modifications are not identified or explained in the final order. Petitioner concludes that the TSPC violated ORS 183.650(2) and that reversal of the final order is a proper remedy for that violation.

---

[8] Among other things, the TSPC deleted the ALJ's findings that "notoriety [about the January 2001 incident] in the community was not widespread" and that, at the time of the incident, petitioner had ingested drugs as part of a suicide attempt.

[9] With respect to those modifications, petitioner disagrees with the TSPC's assessment of the state of the evidence. We need not resolve the dispute here.

The TSPC responds to that argument on a number of levels. The TSPC's primary response is that petitioner has failed to show that its various modifications to the ALJ's proposed order were "substantial" modifications within the meaning of ORS 183.650(2).[10] The TSPC notes that, according to the administrative rules in effect at the time of the hearing, "an agency modifies a proposed order in a 'substantial manner' when the effect of the modifications is to change the outcome or the basis for the order." OAR 137-003-0665(3) (2001).[11] Relying on the foregoing rule, the TSPC asserts that, to prevail on her claim, petitioner must show that "a challenged modification to the ALJ's proposed order changed the outcome or basis of the order and it was not adequately identified and explained in the commission's final order." Because petitioner has not made that showing with respect to any of the commission's modifications, the TSPC argues, her claim of error under ORS 183.650(2) necessarily fails.

Assuming that the definition of "substantial manner" in OAR 137-003-0665(3) (2001) reasonably conforms to the legislature's intentions, the TSPC's description of petitioner's burden under that rule nonetheless is based on an erroneous reading of that rule. The TSPC suggests that petitioner must identify each modification that she believes to be substantial and demonstrate that each one, *by itself*, changed the outcome or basis of the order. But the rule refers to "the effect of the modifications" (plural) as changing the outcome. Under that wording, the agency's modifications are sufficiently substantial to trigger the identification and explanation requirements of ORS 183.650(2) if, whether viewed individually *or* together, they have the effect of changing the

[10] On a more basic level, the TSPC argues that we should not consider petitioner's challenge under ORS 183.650(2) because she failed to raise it before the TSPC. In that regard, it notes, correctly, that, in excepting to the TSPC's proposed final order, petitioner complained about the wholesale nature of the TSPC's changes *but did not cite ORS 183.650(2) or challenge the TSPC's failure to identify and explain the changes as that statute requires.* Although we recognize the distinction that the TSPC makes (and although we think that the question is a close one), we ultimately conclude that a demand for an explanation is implicit in petitioner's exceptions.

[11] OAR 137-003-0665(3) (2001) has since been amended and now provides that "an agency modifies a proposed order in a 'substantial manner' when the effect of the modifications is to change the outcome or the basis for the order *or to change a finding of fact.*"

outcome. It follows that the TSPC's theory about the showing that petitioner was required to make is incorrect: Whatever the effect of any single modification might have been, it is clear that the effect of the modifications *as a whole* was to support the TSPC's theory that petitioner had engaged in a months-long pattern of angry and delusional behavior and that suspension of her license therefore was appropriate.

The TSPC also argues that it reached a different outcome based solely on its different interpretation of its "own rules and statutes" and that, as such, none of the factual changes that petitioner points to contributed to any modification that could be deemed substantial. We disagree. At the very least, the TSPC relied on the factual additions, deletions, and alterations that petitioner identifies to reject the ALJ's decisions respecting the existence of mitigating circumstances and the appropriate sanction.

In summary, we hold that the TSPC modified the ALJ's proposed order in a substantial manner and that it therefore was required to identify its modifications and explain why it made them. It failed to do so. When and if it issues a new final order on remand, it should, consistent with its obligation under ORS 183.650(2), identify and explain any deletions, additions, or alterations that modify the ALJ's proposed order in a substantial manner.

The decision of the Court of Appeals is reversed. The final order of the Teacher Standards and Practices Commission is reversed, and the case is remanded to the Teacher Standards and Practices Commission for further consideration.