Argued and submitted February 8, reversed and remanded December 26, 2013

Charles S. TALBOTT,
*Petitioner,*

*v.*

TEACHER STANDARDS
& PRACTICES COMMISSION,
*Respondent.*

Teacher Standards and Practices Commission
900885; A147648

317 P3d 347

Barbara J. Diamond argued the cause for petitioner. With her on the briefs was Diamond Law.

Erin C. Lagesen, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Duncan, Judge.

DUNCAN, J.

## DUNCAN, J.

In this administrative case, the Teacher Standards and Practices Commission (TSPC) alleged that respondent, a teacher, had violated the TSPC's administrative rules in numerous ways. After a hearing, an administrative law judge (ALJ) issued a proposed order determining that respondent's conduct did not violate any TSPC rules. On review of the ALJ's proposed order, the TSPC determined that respondent had engaged in four instances of gross neglect of duty in violation of OAR 584-020-0040(4) and ORS 342.175 by giving false answers to two questions on an employment application and leaving an offensive letter for the parent of a student and an offensive book for respondent's former principal. As a sanction for the violations, the TSPC suspended respondent's teaching license for six months and imposed four years of probation after the license is reinstated.

Respondent seeks judicial review, contending that, with respect to his answers to the questions on the employment application, the TSPC erred by modifying several findings of fact in the ALJ's order without clear and convincing evidence in support of its new findings. ORS 183.650(3). With respect to the written material that respondent left for the parent and the former principal, respondent contends that the TSPC misapplied its administrative rules by disciplining him based on conduct that lacked a sufficient nexus to his professional responsibilities and that the TSPC violated Article I, section 8, of the Oregon Constitution by disciplining him based on the content of his speech. Finally, respondent contends, the TSPC failed to adequately explain its choice of sanction.

On *de novo* review of the modified factual findings, ORS 183.650(4),[1] we disagree with the TSPC's modifications of the ALJ's findings of fact and find that respondent did

---

[1] ORS 183.650(4) provides:

"Notwithstanding ORS 19.415(3), if a party seeks judicial review of an agency's modification of a finding of historical fact under subsection (3) of this section, the court shall make an independent finding of the fact in dispute by conducting a review de novo of the record viewed as a whole. If the court decides that the agency erred in modifying the finding of historical fact made by the administrative law judge, the court shall remand the matter to the agency for entry of an order consistent with the court's judgment."

not knowingly give false answers to any of the questions on the employment application. In light of that finding, the TSPC cannot discipline respondent for his answers on the employment application. We conclude that the TSPC did not err in determining that respondent's conduct in leaving an offensive letter for the parent of a student constituted gross neglect of duty under OAR 584-020-0040(4) and ORS 342.175. Respondent did not preserve a constitutional challenge to the discipline imposed for his letter to the parent; accordingly, that basis for discipline remains valid. However, the TSPC did err in determining that respondent's conduct in leaving an offensive book for his former principal constituted gross neglect of duty; thus, we do not reach respondent's constitutional challenge to that basis for discipline. In light of our disposition of his other claims, we do not reach respondent's argument regarding the appropriate sanction, and we reverse and remand.

## I. FACTS

We take the facts, other than the modified factual findings, from the final order and uncontroverted evidence in the record. *Kniss v. PERB*, 184 Or App 47, 49, 55 P3d 526 (2002). We discuss the modified factual findings in greater detail in our analysis.

Respondent, who had prior teaching experience but had not taught in Oregon in several years other than as a substitute teacher, was hired to teach middle and high school language arts in the Central Linn School District for the 2006-2007 school year. Before school started for the year, the principal and the athletic director at Central Linn High School were fired. An assistant principal was briefly made principal, but that person was also fired and, before the first teacher in-service training day in August 2006, Julie Knoedler became principal. On that day, Knoedler and the superintendent of the district, Kermit Jones, approached respondent and asked him to be the interim athletic director. Respondent accepted the offer and took over the duties of the athletic director.

James Kizur was Central Linn's new football coach for the 2006-2007 school year. In mid-September of 2006,

Kizur approached respondent shortly before a football game and asked whether a particular player should be allowed to play. Respondent concluded that the player was facing a suspension but that he should be allowed to play in that evening's game. A few days later, based on the decision to allow the player to play, Jones asked Kizur to resign as football coach. Before a school board meeting to consider Kizur's situation, Knoedler and Jones told respondent that Kizur had "tried to work" him. Nevertheless, respondent spoke in favor of Kizur at the school board meeting, and the board voted to retain Kizur as football coach.

After that incident, the relationship between respondent and Knoedler soured. Respondent had applied for the permanent athletic director position, but Knoedler solicited an application from Donald Boyd and selected him for the position. Respondent had been hired as the girls' basketball coach for the year, but, in January 2007, with the assistance of his teachers' union consultant, James Sundell, he negotiated a resignation from that position.

In mid-January 2007, Knoedler put respondent on a program of assistance for improvement to address what she perceived as his weaknesses as a teacher. The district hired an outside consultant to work with respondent in the classroom. The consultant found respondent receptive to new ideas and eager to work with her.

Respondent discussed his and Knoedler's working relationship with Sundell. They determined that it would be best for respondent to seek work elsewhere rather than try to salvage the soured relationship with Knoedler. With Sundell's assistance, respondent negotiated a resignation agreement effective at the end of the school year. Around the same time, in January or February 2007, the superintendent, Jones, resigned.

After he negotiated his resignation agreement with Central Linn, respondent applied for other teaching jobs for the 2007-2008 school year. In April 2007, he filled out an application through a website called EdZapp, which is used by many school districts to fill open positions. The application included questions about whether respondent had ever

left education-related employment while the subject of investigation, whether he was currently the subject of investigation, and whether he had ever failed to complete an education employment contract. Respondent answered "no" to each of those questions.

In the late spring of 2007, Kim Smith, a parent of one of respondent's students who also worked at the school and whom respondent described as Knoedler's "right-hand man" complained, in writing, to Knoedler about respondent's teaching processes and classroom environment. Knoedler then asked respondent for copies of his lesson plans and grade book, both by e-mail and in person, but respondent did not provide them. Knoedler placed respondent on unpaid leave with five days remaining in the school year. In a letter informing him that he had been placed on leave, Knoedler stated that "the superintendent will be reporting, per his legal obligation, your suspected gross neglect of duty to the [TSPC]."

After being placed on leave, respondent, with Sundell's help, filed a grievance against the district, alleging that Knoedler had violated the collective bargaining agreement in numerous ways. On July 24, 2007, the new superintendent agreed to hear the grievance, and, on August 23, 2007, respondent and the district entered into an agreement under which respondent would drop his grievance and the district would pay respondent for the remainder of the school year.

One of the districts that received respondent's EdZapp application was the North Santiam school district. Terry Butler, the human resources director for that district, interviewed respondent. After the interview, Butler asked respondent to fill out a preemployment background form, which included three relevant background questions:

"[(1)] Have you ever left any educational or school-related employment, voluntarily or involuntarily, while the subject of an inquiry, review or investigation of alleged misconduct or alleged violation of professional standards of conduct, or when you had reason to believe such investigation was imminent?

"[(2)]  Are you currently the subject of an inquiry, review or investigation for alleged misconduct or alleged violation of professional standards of conduct?

"[(3)]  Have you ever failed to complete a contract for educational services in any educational or school-related position, or for any alleged misconduct or alleged violation of professional standards of conduct been placed on leave by your employer or left such employment prior to the end of the contract term?"

After consulting Sundell about how he should answer, respondent answered "no" to the first and third questions and "yes" to the second question.

In accordance with the form's instructions, respondent also submitted a letter explaining his "yes" answer to the second question. At the start of the letter, respondent explained that he was providing the "Cliff Notes version" of his employment history with Central Linn and stated, "I can go into greater detail if you have any additional questions or concerns." After summarizing his duties throughout the year, noting his disagreement with Knoedler, and explaining that he and Knoedler both did not want him to return the next year, he stated:

"Principal made unfounded allegations with four days remaining in the school year that I had neglected some of my teaching duties.

"Disagreement appears to be headed to arbitration. James Sundell * * * filed a grievance on my behalf against principal. Mr. Sundell believes that the principal has violated at least seven articles of the Central Linn School District contract."

At the end of the letter, respondent stated, "I also want to encourage anybody who has concerns to also contact James Sundell * * *."

Respondent faxed the form and his letter to Butler on July 29, 2007. Butler met with respondent to discuss his "yes" answer and his letter. She did not contact anyone at Central Linn. The North Santiam district hired respondent for the 2007-2008 school year.

On September 4, 2007, the first day of school in the Central Linn district, respondent went to Central Linn. He dropped off gifts for four former students. Then he put a "graded" copy of Smith's complaint letter into her mailbox. Where Smith had misspelled "complaint," respondent wrote, "Please see [Smith's daughter] for correct spelling!" At the end, respondent gave Smith a B+ for a seventh grade score, and an F as a University of Oregon School of Journalism grade.

Then respondent asked to speak with Knoedler in her office. He asked her for a reference letter that they both believed that she was obliged to provide. Then he told her his low opinion of her work as principal. He gave her a book entitled *The Girl's Guide to Being a Boss (Without Being a Bitch)*, in which he had bookmarked the chapter "Don't Try This at Work: Ten Ways to Alienate Your Staff" and the section "Bad Boss Behavior 10: Being a Jealous Julie."

The Central Linn superintendent reported Knoedler's allegations about respondent's neglect of duty to the TSPC. At some point thereafter, the TSPC began an investigation of respondent's conduct. In March 2008, respondent had two meetings with Jack Adams, who was the superintendent of the North Santiam district, and Butler, who, as noted above, was the North Santiam district's human resources director. Adams and Butler testified at the hearing that, at the second of those meetings, respondent admitted to them that he had falsified his answers to questions on an application in order to get an interview with the North Santiam district. Adams reported that to the TSPC.

The TSPC eventually provided respondent a "notice of opportunity for hearing" listing numerous allegations of actionable misconduct. ORS 342.176(5). It alleged that respondent had failed to cooperate with his principal, Knoedler, on several occasions; failed to keep grades; failed to adequately manage his classroom; knowingly falsified a document or made a knowing misrepresentation directly related to employment and admitted to Adams that he had lied; used harassing and disrespectful language toward Knoedler; and left "crude and disrespectful written material" for Knoedler and Smith.

## II.   LEGAL BACKGROUND

Before we relate the procedural history that led to this judicial review proceeding, we set out the relevant statutes and administrative rules. ORS 342.175(1) provides that the TSPC

"may suspend or revoke the license or registration of a teacher or administrator, discipline a teacher or administrator or suspend or revoke the right of any person to apply for a license or registration if the licensee, registrant or applicant has held a license or registration at any time within five years prior to issuance of the notice of charges under ORS 342.176 based on the following:

"* * * * *

"(b)   Gross neglect of duty[.]"

ORS 342.175(6) provides:

"Violation of rules adopted by the commission relating to competent and ethical performance of professional duties shall be admissible as evidence of gross neglect of duty * * *."

The TSPC has defined "gross neglect of duty" in OAR 584-020-0040(4):

"Gross neglect of duty is any serious and material inattention to or breach of professional responsibilities. The following may be admissible as evidence of gross neglect of duty. Consideration may include but is not limited to:

"* * * * *

"(c)   Knowing falsification of any document or knowing misrepresentation directly related to licensure, employment, or professional duties;

"* * * * *

"(n)   Substantial deviation from professional standards of competency set forth in OAR 584-020-0010 through 584-020-0030[.]"

In turn, OAR 584-020-0010 provides:

"The educator demonstrates a commitment to:

"(1)   Recognize the worth and dignity of all persons and respect for [sic] each individual[.]"

Thus, the TSPC has statutory authority to discipline a teacher for "gross neglect of duty," ORS 342.175(1)(b), and evidence of gross neglect of duty includes "[v]iolation of rules * * * relating to competent and ethical performance of professional duties." ORS 342.175(6). Under TSPC rules, the TSPC may discipline a teacher for "gross neglect of duty" when the teacher's conduct reflects "any serious and material inattention to or breach of professional responsibilities." OAR 584-020-0040(4). The TSPC has defined those responsibilities to prohibit knowing falsification of a document and knowing misrepresentation related to employment and to include demonstration of a commitment to recognize the worth and dignity of all persons and to respect each individual.

## III. PROCEDURAL HISTORY

When respondent received notice of the TSPC's allegations against him, he requested a hearing before an ALJ. After the hearing, the ALJ issued a proposed order concluding that the TSPC had not proved any of the allegations and recommending that the notice of opportunity for hearing be reversed. The most important of the ALJ's findings was that "[t]he clear import of the testimony of the two chief witnesses, [respondent] and principal Knoedler, is that they have an abiding dislike for one another—a dislike that overwhelmed the credibility of their testimony." The ALJ noted numerous points on which Knoedler had contradicted herself and explained that "[h]er testimony was inconsistent, evasive, and unconvincing on contested issues." He then pointed out that respondent had unconvincingly portrayed his return of the "graded" complaint to Smith as an altruistic gesture and implausibly contended that he had presented Knoedler with a different edition of *The Girl's Guide to Being a Boss (Without Being a Bitch)*, one that omitted the word "bitch" from the title.

The ALJ concluded that, because Knoedler was the only witness who testified to problems with respondent's teaching, insubordination, and purported failure to keep grades and her testimony was not credible, the TSPC had failed to prove those allegations. Likewise, the ALJ concluded that the TSPC had failed to prove that respondent had caused a disturbance or used harassing and disrespectful

language toward the building principal, because "[n]either [Knoedler] nor [respondent] testified credibly about the return visit, and no one else testified at all." With respect to the book and the letter, the ALJ concluded that, although respondent had violated his duty to "[r]ecognize the worth and dignity of all persons and respect * * * each individual," OAR 584-020-0010(1), the conduct did not rise to the level of a "[s]ubstantial deviation from professional standards of competency." OAR 584-020-0040(4)(n). The ALJ reasoned:

> "In light of their mutual dislike of one another, the interaction between [Knoedler] and * * * respondent did not rise to the level of a 'substantial deviation.' Neither did * * * respondent's snide response to the parent whom he considered to be [Knoedler's] 'right-hand man'—in that context, it was part of the same transaction. The lack of respect between [Knoedler] and * * * respondent clouded both their actions, but a single manifestation of their mutual enmity does not demonstrate a 'substantial' deviation by * * * respondent."

The ALJ also was not convinced that respondent had knowingly falsified a document or knowingly misrepresented a matter related to employment. He found that respondent had answered the questions on the North Santiam form correctly, based on Sundell's advice. In the alternative, the ALJ found that, even if respondent's answers to the first and third questions were incorrect, his reliance on Sundell's advice established that he had answered the questions in good faith.

Finally, the ALJ noted that the notice of opportunity for hearing

> "also alleges that * * * respondent admitted to the North Santiam superintendent that he had lied on his answers to the questions [on the preemployment background form]. The evidence does not bear that out. The superintendent did testify that * * * respondent admitted to him that the answers were changed in order to increase * * * respondent's chances of getting hired. He could not explain, however, why * * * respondent would lie on those two questions but would answer 'yes' to the question about whether he currently was the subject of investigation. The superintendent would have expected his staff to investigate any 'yes' answer to the questions, and the human resources director did. She does not know where her notes from the meeting

with * * * respondent were, however, and the summary memorandum she drafted after the meeting was never offered as evidence at the hearing. It may be that both the superintendent and human resources director *concluded* that * * * respondent had admitted to lying, but the record does not support such a finding. It makes no sense that he would lie on his answers to two questions but answer truthfully to the third."

(Emphasis in original.)

The TSPC reviewed the ALJ's order and issued an amended proposed order. *See* ORS 183.650 (procedure for agency's revision of a proposed order); OAR 137-003-0655 (governing amended proposed orders). It concluded that respondent's conduct in giving the book to Knoedler and the letter to Smith constituted two substantial deviations from professional standards of competency by failure to "[r]ecognize the worth and dignity of all persons and respect * * * each individual," OAR 584-020-0040(4)(n); OAR 584-020-0010(1). The TSPC also rejected several of the ALJ's findings of fact regarding respondent's application to North Santiam and held that respondent knowingly falsified a document or made a knowing misrepresentation directly related to employment, OAR 584-020-0040(4)(c), by answering "no" to the first and third background questions set out above, 260 Or App at 360-61. The amended proposed order would have denied respondent's application for renewal of his teaching license.

Respondent submitted numerous exceptions to the TSPC's amended proposed order. The TSPC issued a final order that adhered to the facts and legal reasoning of the amended proposed order but changed the discipline from denial of respondent's application to a six-month suspension of respondent's license followed by four years' probation. Respondent seeks judicial review of the final order.

## IV. ANALYSIS

### A. *Modified Findings of Fact*

We begin with respondent's challenge to the TSPC's changes to the ALJ's findings of fact. We review facts found by an ALJ and modified by an agency *de novo*. ORS 183.650(4); *Corcoran v. Board of Nursing*, 197 Or App 517,

525, 107 P3d 627 (2005). Before we undertake that review, however, we address two procedural arguments raised by the TSPC. First, we consider and reject the TSPC's assertion that respondent was required, and failed, to preserve his disagreement with the TSPC's factual changes to the ALJ's order by excepting to each modified finding. Second, before reviewing each challenged item, we determine whether the TSPC actually modified a factual finding or whether, as the TSPC contends, some of the purported factual modifications were only rejections of the ALJ's legal reasoning.

We reject the TSPC's preservation argument because, as the TSPC acknowledges, we have already decided the issue in respondent's favor. In *Becklin v. Board of Examiners for Engineering*, 195 Or App 186, 205, 97 P3d 1216 (2004), *rev den*, 338 Or 16 (2005), we explained that, when an ALJ rules in a party's favor and the agency modifies some or all of the ALJ's factual findings and reverses the ALJ's ruling under ORS 183.650(3), no specific objection to the agency's modification of the ALJ's findings is necessary to preserve a challenge to the modification. That is so because "the issue of which way the evidence preponderate[s]" as to the ultimate issue is "squarely put before the decision-maker" at the hearing before the ALJ. *Becklin*, 195 Or App at 205. After the ALJ finds facts in the respondent's favor and the agency modifies some or all of those findings, "[t]here [is] nothing left for [the] respondent to preserve" because the agency has "already *** addressed—and rejected—[the respondent's] contention as to the proper evaluation of the evidence on *de novo* review." *Id.*

Here, because respondent raised before the ALJ his argument that the evidence preponderated in his favor— and the ALJ agreed with that view—there was no need for respondent to take exception to the TSPC's modifications of the ALJ's factual findings in order to preserve his objections for judicial review. The TSPC was aware of respondent's view of the facts and rejected it.

1. *The Admission*

All three of the factual issues that respondent raises involve the allegation that he knowingly falsified or made knowing misrepresentations on his employment application

to the North Santiam district. We first address respondent's challenge to the TSPC's acceptance of Adams's testimony that respondent "admitted to him on March 14[, 2007,] that [respondent] had falsified his employment application." The TSPC concedes that its acceptance of Adams's testimony after the ALJ rejected it is a modification of a finding of historical fact.

The ALJ's finding with respect to the allegation that respondent admitted to Adams that he had lied on the preemployment questions is set out in full above, 260 Or App at 365. The ALJ found that "[t]he evidence does not bear * * * out" Adams's testimony that respondent told him that respondent had changed the answers to two of the preemployment questions to increase his chances of getting hired. It was undisputed that respondent had answered "yes" to one of the questions, and Adams and Butler testified that a single "yes" answer would—and did—trigger further investigation of respondent. The ALJ noted that the testimony might be credible, in that Adams and Butler might have thought they heard respondent admit to lying on the application. Nevertheless, he found that the testimony did not support the conclusion that respondent had lied, because no one was able to explain how changing two of the three answers to "no" would have increased respondent's chances of being hired.

The TSPC disagreed. It explained, "Whether or not * * * Adams could explain why respondent answered 'yes' on a different question does not negate his credible testimony that respondent admitted falsifying his employment application."

After reviewing the record, we find that the testimony of Adams and Butler that respondent admitted to them that he had changed answers on an application form does not support a finding that respondent knowingly provided incorrect answers to the two background questions. That is so because neither Adams nor Butler was able to coherently explain what respondent had admitted to doing. Each seemed confused about the order and timing of the two applications that respondent filled out, and their testimony, even if it is credible despite the lack of clear recollection that

it reflects, does not establish that respondent admitted to changing his answers on the preemployment background form.[2]

## 2. *Sundell's Recommendation*

Next we consider respondent's challenge to the TSPC's rejection of the ALJ's finding that, "[b]efore completing his responses [to the preemployment background questions on North Santiam's form], * * * respondent called his union's consultant to discuss the questions, and answered the questions as the consultant recommended." The TSPC rejected the phrase "and answered the questions as the consultant recommended" and instead found that "[t]he consultant told respondent to be 'honest' and 'upfront' on the application for North Santiam." The TSPC explained, "The Commission rejects this portion of the finding of fact because it is not supported by the evidence. It is a commentary on the evidence that is not a proper finding of fact."

On appeal, the TSPC renews its argument that the finding that respondent answered the questions as the consultant recommended is a commentary on the evidence, not a finding of fact. We reject that argument without further discussion.

On *de novo* review, we make essentially the same finding that the ALJ did. During his testimony, the union consultant, Sundell, agreed that respondent checked the boxes on the preemployment background form "in the manner [he] advised [respondent] to check them." That testimony convinces us that respondent answered the questions as Sundell advised.

## 3. *Knowing Falsification or Misrepresentation*

We turn to respondent's challenge to the TSPC's modification of the ALJ's findings regarding respondent's mental state in answering "no" to the two preemployment background questions. With respect to the allegation that

---

[2] Specifically, both Adams and Butler testified that respondent had changed his answers on the preemployment background form because he had submitted it to many districts and had failed to get any interviews. However, the record demonstrates that respondent filled out that form only once, for the North Santiam district, and he did so only after his interview with that district.

respondent knowingly falsified a document or knowingly misrepresented the facts by answering "no" to the first and third preemployment background questions, the ALJ found as follows:

> "[R]espondent answered 'no' to both [of the questions at issue], but before doing so he called his union's consultant to discuss the questions. He then answered the questions as the consultant recommended. He answered 'no' to the question about leaving education employment while under investigation because he had completed his contract with Central Linn and was unaware of any investigation at the end of the contract. He also answered 'no' to the question about whether he had failed to complete an education-employment contract. The consultant recommended the answer because he viewed * * * respondent as having completed both the school year and his contract. The record does not establish that he lied in answering the questions. Within the context and timing, the answers were accurate."

In a footnote, the ALJ found, in the alternative, that, "[e]ven if the answers had been inaccurate, however, the record still would establish that * * * respondent's seeking the consultant's advice was a good-faith attempt simply to answer the questions correctly, not to deceive the school district." The TSPC rejected the ALJ's determination that respondent had answered the questions correctly, pointing out ways in which, in its view, respondent's answers to the preemployment questions were incorrect. The TSPC also found that respondent knew that his answers were incorrect.

We begin by considering the TSPC's argument that its change to the ALJ's order did not involve modification of findings of fact. The parties agree that the TSPC's discussion of respondent's answers to the questions involves some legal reasoning about what constitutes a "knowing falsification" or "knowing misrepresentation" as those terms are used in OAR 584-020-0040(4)(c). Respondent contends that, in addition to rejecting the ALJ's legal reasoning, the TSPC also modified the ALJ's findings of fact on the topic. The TSPC remonstrates that it "simply rejected the ALJ's *reasoning* supporting his ultimate conclusion that respondent's conduct did not violate the commission's rule." (Emphasis in original.)

Respondent has the better argument. Although legal reasoning is required to determine whether respondent violated OAR 584-020-0040(4)(c) by engaging in a knowing falsification or knowing misrepresentation, the legal question cannot be answered without a predicate finding of fact about what respondent's mental state was—that is, what was in respondent's mind when he answered "no" to the two questions. *See* ORS 183.650(3) ("[An ALJ] makes a finding of historical fact if the [ALJ] determines that an event did or did not occur in the past or that a circumstance or status did or did not exist either before the hearing or at the time of the hearing.); *State v. Lockamy*, 227 Or App 108, 114-15, 204 P3d 822 (2009) (the defendant's knowledge—that is, what was in his mind when he engaged in the conduct at issue—is a question of fact).

The ALJ found, for two alternative reasons, that respondent intended to answer the questions correctly: First, he found that the fact that respondent had answered the questions correctly demonstrated that respondent intended to answer the questions correctly. Second, and alternatively, the ALJ found that, even if respondent had answered the questions incorrectly, respondent lacked any culpable mental state when he answered "no" because he answered in good faith; that is, respondent's request for Sundell's advice in answering the questions was a reliable and conclusive external indication that respondent intended to answer the questions correctly. Any failure to answer the questions correctly was accidental.

The TSPC modified those findings of fact. First, the TSPC rejected the ALJ's finding that respondent had answered the questions correctly, explaining ways in which respondent's answers were incorrect. Second, the TSPC rejected the ALJ's finding that respondent had answered in good faith—that is, with the intention of providing correct answers—by reweighing the evidence and finding that respondent's reliance on Sundell's advice was "not sufficient to overcome respondent's knowledge of the facts as of the date he answered this question." That is, in the TSPC's view, respondent's request for Sundell's advice was not a reliable or conclusive external sign that respondent intended to answer

the questions correctly. Instead, the TSPC found that, when respondent answered the questions, he did not answer them in good faith, that is, he did not intend to answer them correctly. That is a modification of a finding of fact.[3]

On *de novo* review, we agree with the ALJ's alternative finding that, regardless of whether respondent's answers to the questions were correct, respondent answered both questions in good faith—that is, he intended to answer correctly. We reach that conclusion based on respondent's reliance on Sundell's advice and the fact that respondent answered two potential "red flag" questions in the negative and the third in the affirmative and included a letter explaining his situation with respect to Knoedler and the Central Linn district.

Because respondent intended to answer the pre-employment background questions correctly, under any plausible interpretation of the rule, respondent did not violate OAR 584-020-0040(4)(c) by "knowing[ly] falsify[ing] a document" or "knowing[ly] misrepresent[ing]" a fact. Accordingly, as to those allegations, we reverse and remand to the TSPC for entry of an order consistent with our judgment. ORS 183.650(4).

B. *The Book and the Letter*

Next we address respondent's contention that his conduct in leaving the letter for Smith and giving the book to Knoedler did not constitute "gross neglect of duty" under OAR 584-020-0040(4) and a Supreme Court case interpreting that rule in light of ORS 342.175. Before doing so,

---

[3] To the extent that the TSPC accepted the ALJ's finding that respondent intended to answer the questions correctly and, instead, reasoned that, despite that finding, respondent knowingly falsified a document or knowingly misrepresented a fact in violation of OAR 584-020-0040(4)(c), that is an implausible interpretation of the rule. An act is "knowing" when it is done "with an awareness that the conduct of the person is of a nature so described." *See* ORS 161.085(8) (so defining "knowing" for purposes of the Oregon Criminal Code of 1971). A person who intends to answer a question correctly necessarily does not answer incorrectly with an awareness that the answer is incorrect. As the TSPC acknowledged in the final order, a knowing misrepresentation requires "awareness that the individual is providing misleading or incorrect information." Thus, the ALJ's finding of respondent's "good faith" in answering the questions is incompatible with the legal conclusion that respondent knowingly falsified a document or knowingly misrepresented a fact.

however, we pause to note our disagreement with the TSPC's contention that respondent's failure to make his argument in terms of the "plausibility" of the TSPC's interpretation of its rule or to cite *Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 881 P2d 119 (1994), is an independent reason for us not to consider his challenge to the rule. The cases that the TSPC cites for that proposition fail to support it. Although we will not consider an argument that is not raised by a respondent's assignment of error, *e.g., Day v. Elections Division*, 246 Or App 140, 151, 265 P3d 16 (2011), and we will apply the correct standard of review for an agency's interpretation of a nonstatutory term even where the respondent does not identify the standard, *e.g., Thompson v. LCDC*, 227 Or App 120, 132-33, 204 P3d 808 (2009), we know of no authority preventing us from considering a clearly preserved and raised challenge to the meaning and application of a rule, even if the respondent does not frame that challenge in terms of plausibility or cite *Don't Waste Oregon Com. Cf. Teacher Standards and Practices v. Bergerson*, 342 Or 301, 310-12, 153 P3d 84 (2007) (rejecting the TSPC's interpretation of the term "gross neglect of duty" in same administrative rule at issue here in light of the rule's conflict with another source of legal authority—namely, the statute authorizing the rule—without any mention of plausibility or citation to *Don't Waste Oregon Com.*).

We turn to the merits of respondent's argument. We accept any "plausible interpretation" by an agency of its own administrative rule as long as the interpretation is not "inconsistent with the wording of the rule itself, or with the rule's context, or with any other source of law." *Don't Waste Oregon Com.*, 320 Or at 142. When the source of law that is purportedly incompatible with the rule is a statute, we employ our ordinary method of statutory interpretation under *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009), and *Springfield Education Assn. v. School Dist.*, 290 Or 217, 621 P2d 547 (1980), to determine the legislature's intent. When an agency's interpretation of its rule conflicts with the intent of the legislature in enacting the statutory provision, the agency's interpretation must give way to the statutory limitation. *See, e.g., Bergerson*, 342 Or at 311-12 (interpreting the inexact statutory terms "gross neglect of

duty" and "professional duty" in keeping with their ordinary meanings and concluding that those meanings conflicted with the TSPC's interpretation of its administrative rule); *Franklin v. Employment Dept.*, 254 Or App 656, 664, 294 P3d 554 (2013) (the scope of the Employment Department's interpretation of the term "failure to maintain a license," as used in its administrative rule, was limited by the legislative intent embodied in the statutory term "misconduct").

Respondent contends that there is no nexus between his conduct in leaving the letter for Smith and giving the book to Knoedler, which he characterizes as a "single private act of rudeness," and his professional responsibilities that is sufficient to support the TSPC's conclusion that he committed gross neglect of duty. That argument is based on *Bergerson,* in which the Supreme Court narrowed the reach of OAR 584-020-0040(4) in light of the meaning of the statutory term "gross neglect of duty," ORS 342.175. In light of respondent's argument, our task is to determine whether the TSPC's interpretation of ORS 584-020-0040(4) to cover respondent's conduct in this case conflicts with the legislature's grant of authority to the TSPC to discipline teachers for "gross neglect of duty," ORS 342.175. We begin by considering *Bergerson.*

In *Bergerson,* the petitioner had committed a crime, first-degree criminal mischief, by ramming her car into her husband's truck, causing damage to the truck and the house of the husband's new girlfriend, during a suicide attempt. 342 Or at 305. The TSPC suspended the petitioner's teaching license as a result of that conduct, reasoning that the petitioner had committed "gross neglect of duty," ORS 342.175; OAR 584-020-0040(4), by "substantial[ly] deviat[ing] from professional standards of ethics" promulgated by the TSPC. *Bergerson,* 342 Or at 308. The relevant TSPC standard of ethics provided:

> "'The ethical educator is a person who accepts the requirements of membership in the teaching profession and acts *at all times* in ethical ways. In so doing the ethical educator considers the needs of the students, the district, and the profession.
>
> "'* * * * *

"'The ethical educator, in fulfilling obligations to the profession, will:

"'(a)   Maintain the dignity of the profession by *respecting and obeying the law*, exemplifying personal integrity and honesty[.]'"

*Id.* (quoting OAR 584-020-0035) (emphases and brackets in *Bergerson*).

The Supreme Court agreed with the petitioner that the TSPC's definition of "gross neglect of duty" to encompass all unethical and illegal conduct exceeded its authority under ORS 342.175. *Bergerson*, 342 Or at 311-12. The court determined that the statutory term "gross neglect of duty" was an inexact term under *Springfield Education Assn.* and that the TSPC's definition of the term to include a requirement that teachers behave ethically and lawfully at all times was inconsistent with the legislature's intent. The court explained:

"In ordinary parlance, professional duties are specific to a profession and are distinct from the moral and civic obligations of all citizens to behave ethically and to obey the law at all times. * * * Depending on the profession at issue, there may be some areas where professional responsibilities and universally applicable moral and civic obligations may overlap, but the TSPC's position that teachers have a *professional* obligation to behave ethically and lawfully 'at all times' eradicates the boundary between private and professional obligations altogether."

*Id.* at 312 (emphasis in original). Because the TSPC had not identified any narrower basis for its conclusion that the petitioner had committed "gross neglect of duty," the court held that the TSPC had erred in suspending the petitioner's license. *Id.*

In a footnote, the court explained that "the ALJ interpreted the rules as extending to unlawful and unethical conduct that occurs off-duty and off-premises, but only if there is a specific and demonstrable nexus between the conduct and an educator's professional responsibilities." It concluded that "[t]hat interpretation of the rule may be consistent with the legislative intent expressed in ORS 342.175, but the TSPC declined to adopt it." *Bergerson*, 342 Or at 312 n 3.

Respondent argues that his conduct in this case is akin to the petitioner's conduct in *Bergerson* and, accordingly, that the TSPC cannot discipline him for it. As a general matter, under ORS 342.175, as interpreted in *Bergerson*, the TSPC cannot discipline teachers for deviating substantially from their "competency" obligation to "recognize the worth and dignity of all persons and respect * * * each individual" at all times, in all settings. OAR 584-020-0010(1). That would "eradicate[] the boundary between private and professional obligations altogether." *Bergerson*, 342 Or at 312.

However, unlike in *Bergerson*, in this case, the TSPC relied on more than a blanket requirement that a teacher demonstrate respect for all individuals, at all times. Rather, it relied on respondent's professional relationships with Smith and Knoedler in concluding that respondent was required to demonstrate respect for them at the time when he gave them offensive written materials. Accordingly, this case poses the question that the court did not reach in *Bergerson*: whether there was a specific and demonstrable nexus between respondent's off-duty, off-premises conduct and his professional responsibilities as an educator.

We begin with the letter and conclude that there was a nexus between respondent's professional responsibilities and his conduct sufficient to satisfy the statutory requirement. As recounted above, Smith was a staff member at Central Linn and the mother of one of respondent's students. In spring 2007, Smith wrote a letter to Knoedler formally complaining about respondent's performance as her daughter's teacher. After respondent had left Central Linn and accepted a new job with the North Santiam district, he returned to Central Linn and left an annotated copy of the letter in Smith's mailbox. Respondent had written disrespectful comments on the letter, "grading" Smith's writing and referring to her daughter by name.

Although it took place while respondent was off duty and while he was off the premises of his current school district, that conduct nevertheless had a specific and demonstrable nexus to respondent's professional responsibilities. Through his comments on Smith's complaint letter, respondent

expressed his disrespect for Smith as a parent and mocked her expression of parental concern about his teaching, which she had written while he was still employed by Central Linn. That conduct was directly related to respondent's professional duties, which, at a minimum, preclude responding to a parent's concerns by intentionally mocking the parent.

By contrast, respondent's conduct in giving the book to Knoedler was a private expression of his opinion, as a former employee, of her management. His expression of that opinion did not take place where students or other staff members would see or hear it; there is no indication of any effect on Knoedler's or respondent's professional responsibilities.

Finally, respondent argues that the TSPC erred in disciplining him for giving the book to Knoedler and the letter to Smith because the TSPC's interpretation of its rule violates Article I, section 8. The TSPC responds that respondent did not preserve that argument. Our conclusion that the TSPC could not discipline respondent for giving the book to Knoedler obviates the need to address the constitutional argument with respect to the book. As to the letter, respondent did not preserve his constitutional argument; he never contended, before the ALJ or the TSPC, that the letter was protected speech for which he could not be disciplined.

## V.  CONCLUSION

In sum, after reviewing the modified findings of fact *de novo*, we find that respondent did not knowingly misrepresent a fact or knowingly falsify a document, OAR 584-020-0040(4)(c), with respect to the preemployment background form that he provided to the North Santiam district. The TSPC did not err in concluding that respondent committed gross neglect of duty under OAR 584-020-0040(4)(n) by deviating substantially from a professional standard of competency by leaving the letter for Smith. However, it did err in concluding that respondent's conduct in giving the book to Knoedler violated OAR 584-020-0040(4)(n).

Reversed and remanded.